UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
FRANK LOBACZ, M.D.,

                    Petitioner,                    **MEMORANDUM & ORDER**

        -against-                                  16-CV-3386(DRH)
                                                   07-CR-744 (DRH)
UNITED STATES OF AMERICA,

                    Respondent,
-------------------------------------------------X

**APPEARANCES:**

**For Petitioner:**
Doar Rieck Kaley & Mack
217 Broadway, Suite 707
New York, New York 10007
By:    John F. Kaley, Esq.

**For Respondent:**
Richard P. Donoghue
Interim United States Attorney, Eastern District of New York
610 Federal Plaza
Central Islip, New York 11722
By:    Michael P. Canty, AUSA


**HURLEY, Senior District Judge:**

        Petitioner Frank Lobacz ("Defendant" or "Lobacz") moves pursuant to 28

U.S.C. § 2255 to vacate, set aside, or correct his sentence arising from a 2010

conviction in this Court.  Lobacz contends he received ineffective assistance from his

trial counsel in violation of his Sixth Amendment right. Having considered all the

bases asserted in support of that claim, the petition is denied.

# BACKGROUND

## I.     Procedural History

On November 12, 2010, Lobacz was convicted, following a jury trial, of two counts of healthcare fraud, one count of filing a false IRS Form 550 regarding withdrawals from a pension account, and three counts of income tax evasion for the years 2000, 2001, and 2002. He was sentenced principally to 65 months incarceration and a term of three years supervised release.

Lobacz appealed his conviction asserting that: (1) he was denied effective assistance of counsel because trial counsel did not move to sever the healthcare counts from the pension and tax fraud counts; (2) the evidence was insufficient to establish the mens rea element of the Form 550 offense; and (3)  the district court erred in calculating the applicable guideline range. On March 26, 2015, his convictions were affirmed by the Second Circuit. *See U.S. v. Lobacz*, 603 Fed. App'x 48 (2d Cir. 2015). The Circuit dismissed Lobacz's ineffective-assistance claim without prejudice to the filing of a petition for relief under 28 U.S.C. § 2255 and rejected the remaining grounds.

Thereafter the present motion was timely filed. While Lobacz has been released from incarceration, he is presently serving his 3-year term of supervised release and therefore is considered in custody for purposes of this motion to vacate.[1]

---

[1] The Court notes that in the alternative Lobacz seeks relief pursuant to a writ of Audita Querela and a writ of error coram nobis. Given the Court's conclusion that he is considered in custody for purposes of 28 U.S.C. § 2255, it need not address these alternative bases for relief.

*See, e.g., Byrd v. Evans*, 420 Fed. App'x 28, 29 (2d Cir. 2011); *Scanio v. United States*, 37 F.3d 858, 860 (2d Cir. 1994). In his motion, Lobacz asserts that he received ineffective assistance of counsel in that trial counsel (1) failed to move for a severance of counts and (2) failed to investigate and present witnesses and evidence.

## II. The Trial Testimony

The following summarizes the testimony at trial.

### A. The Government's Case

#### 1. The Health Care Fraud Scheme

During the relevant time frame, Lobacz was a licensed physician and owner of Frank M. Lobacz, M.D., P.C., a medical practice with offices in Bay Shore, Brentwood and Deer Park, New York. (GA 309.)[2]

In 2000, Lobacz hired Dr. Young Ho Shin, a 70 year-old semi-retired medical practitioner to assist in his medical practice. Dr. Shin worked about three days per week and was paid a salary of $500.00. Dr. Shin did not recall treating Lobacz and claimed never to have treated Lobacz's wife or children, or his family friends, Sander and Elaine Shadoff. Moreover, Dr. Shin did not provide "trigger point injections" (anti-inflamatory injections) as part of his medical practice. However, beginning in 2000 and continuing until 2008, Lobacz submitted insurance claims (1) to Emblem Health-Group Health Inc. ("GHI") for neurotransmitter electrodes,

[2] Reference to "GA" are to the government's appendix submitted as part of its opposition to the instant application. References to "Tr." are to the trial transcript.

trigger point injections and inhalation treatments by Dr. Shin to Lobacz, his wife and his two minor children; and (2) to United Health Care Insurance Company of New York-the Empire Plan ("UHC") for treatment of various ailments by Dr. Shin to the Shadoffs. (Tr. 50-58, 150, 156, 314-19.)

GHI processed over 2,400 claims from 2000 to 2008 and paid over $440,000 to Lobacz for Dr. Shin's purported treatment of Lobacz and his family. These claims evidenced that Lobacz and his family were being treated upwards of four times a week for respiratory ailments. Despite the frequency of these purported treatments, GHI received no other claims for doctor visits - such as claims for asthma specialists, pulmonologists or emergency room treatment, - or for prescription drugs or home treatment equipment, such as nebulizers, typically associated with the treatment of asthma. Moreover, once GHI stopped paying claims submitted under Lobacz's member ID number in 2008, no additional claims for treatments for the Lobacz family were submitted to GHI. Finally, Elaine Shadoff testified that she never observed any of the Lobacz family members exhibiting respiratory difficulties although she spent numerous hours with them on multiple occasions. (Tr. 52-57, 62-63, 246-49.)

Between 2000 and 2008, Lobacz also submitted claims for over 1,200 days of treatment purportedly administered by Dr. Shin to the Shadoffs, resulting in UHC paying approximately $287,000 directly the Shadoffs. They then provided the reimbursement checks to Lobacz or his medical staff, after which they would be endorsed by Lobacz and deposited into his bank accounts. The Shadoffs testified

that the treatment claims submitted to UHC were fraudulent. They were never treated by Dr. Shin; they never received treatments on the weekends; they were out of town during days that they were purportedly by being treated by Dr. Shin; and they did not know what a triggerpoint injection was. (Tr. 144-56, 172-204, 236, 242, 1220-21.)

2. The False IRS Form 550 Regarding
   Withdrawals from Pension Account

In 1989, Lobacz's medical practice put into effect the Frank M. Lobacz, D.O. P.C. Pension Plan, an employee benefit plan. The plan was readopted in 1994 and 2002. The plan had three beneficiaries, including Lobacz. Lobacz was both the plan administrator and trustee of the plan. As such, he was responsible for assuring that the plan was properly maintained so as to be able to provide benefits to its participants, with his specific responsibilities being set forth in the Plan Document. Lobacz hired a third-party administrator, Schloss and Company, to assist in the operation of the Pension Plan. (GA 2-14; Tr. 1008.)

The Plan Document specifically prohibited the mixing of pension funds and personal funds and prohibited a plan administrator/trustee from self-dealing in the assets of the plan. Under the Plan Document a participant was permitted to take a distribution from the Plan only if it was not a prohibited transaction; loans to beneficiaries who were not retired were prohibited with limited exceptions. One such exception was a loan to a beneficiary in an amount of half the beneficiary's interest or $50,000 which ever was less. As trustee/plan administrator Lobacz was

responsible for notifying the third party administrator of any such loan and to assist the third party administrator in creation of paperwork setting forth the terms of the loan. (GA 3-17, 110-116.)

As plan administrator, Lobacz was required by the Internal Revenue Service to file a Form 550 with the Department of Labor each year. The Form 550 sets forth the assets and liabilities of the Plan and notifies the IRS of any nonexempt or "party-in-interest" transactions involving the plan. Schloss and Company would complete the Form 550 based on information provided by Lobacz. Lobacz, as plan administrator, would sign the form attesting under penalty of perjury that its contents was true, correct, and complete to the best of his knowledge and belief. (GA 13-16.)

Beginning in 2000 and continuing into 2002, Lobacz took prohibited withdrawals from the pension plan in the form of wire transfers or checks. He withdrew a total of $381,000 in 2000 and $645,000 in 2002, using the monies to pay off mortgages on properties he owned, including two vacation homes, for credit card bills, and for his daughter's college tuition. Lobacz neither informed the third-party administrator of these withdrawals nor reported them on Form 550 as party-in-interest withdrawals. Specifically, the Form 550 filed for the year 2002 answered no to the question of whether the plan had engaged in any non-exempt transactions with any party in interest.(GA 16-20, 31-47; Tr. 626-60, 1288-98, 2317-18.)

3.    Tax Fraud

Lobacz failed to report the nonexempt withdrawals from the Pension Plan on

his tax returns. Lobacz's accountant and tax preparer, Adley Sampson ("Sampson"), testified he was unaware of any withdrawals from the Pension Plan by Lobacz in 2000 and 2001; he learned of the 2002 withdrawals as a result of events surrounding Lobacz's severe trading loss in August of 2002.  After discussing with Lobacz the taxable nature of the 2002 withdrawals, he opined that if the money was returned in full by year's end, it might qualify as a loan but that such a position was a "weak" one. (Tr. 711, 789-97, 846-48, 963-70.)

Lobacz also failed to report options income of $37,529.54 and $985,433 for the years 2000 and 2001 respectively, withholding information concerning this income from documents he provided to Sampson. Sampson testified that he only became aware of the 2001 options income while assisting Lobacz with matters related to his option trading losses in 2002; he then prepared an amended return for 2001 and advised Lobacz to file it. While Lobacz claimed that he was told that the options income was not taxable, that testimony was problematic in that he had previously reported a loss on options income on his 1997 federal return.  The IRS agent who conducted an audit of Lobacz's income tax returns for 2000, 2001, and 2002 testified that he had  outstanding tax liabilities of $1,282,746.25, $897,951.40 and $705,756.75, respectively for those years as a result of failing to report options income and the Pension Plan withdrawals. (Tr. 610-21, 760-70, 772-85, 797-99, 1163-82.) David Reiss, Lobacz's financial advisor at Prudential where he maintained  both a personal account and an account for the pension plan during the relevant time period, testified that between 2000 and 2002 Lobacz would call fifteen

to twenty times a day and described him as the most involved client he ever had in terms of Lobacz's sophistication and know-how. Reiss described how at market close Lobacz would write down "the price of his positions" and that night would calculate what his trading power for the next day was, a task Prudential used computers for, and that Lobacz's calculations were "uncannily very similar" to the computer's calculations. Reiss described discussions with Lobacz at the end of 2000 wherein Lobacz requested certain transactions so that some losses in his account could be used to offset profits made earlier in the year. Reiss also described various transfers from the pension account to Lobacz's personal account, as well as withdrawals from the pensions account in the form of checks payable to Lobacz, (Tr. 624-25, 630-660, 704.)

## B.      The Defense Case

Four witnesses were called by the defense: three of Lobacz's employees and his wife. In addition, Lobacz testified in own behalf.

Lobacz's office manager testified that Sander Shadoff was treated by office providers, including Dr. Shin and identified medical records that the defense claimed supported that Mr. Shadoff had received trigger point injections by Dr. Shin. She detailed the other doctors who were brought in while Lobacz was unable to practice due to his health issues. She also testified that Samson would call at year end and provide the dollar value of assets that need to be replaced in the pension account. Lobacz's receptionist testified that she saw the Shadoffs at least two times a week when they came in for treatments and that Mrs. Lobacz and the

two Lobacz children received treatments from Dr. Shin. The employee responsible for billing and insurance claims testified that she saw Lobacz's wife and daughters at the office and they received treatments two to three times per week. (Tr. 1392-1410, 1478-84, 1705, 1773-90.)

Lobacz's wife testified that her children routinely received treatments for breathing problems and that she had injections two to three times per week for numerous ailments of her own. (Tr. 1862-92, 1932-33.) According to her testimony, neither she nor the children ever saw any other doctors for treatment of their ailments. (Tr. 1945-53.) She also testified that her husband had a number of hospitalizations after his October 2003 surgery, and his ill health continued after the surgery. (Tr. 1935-39.)

Lobacz testified about his and his family's medical histories and his medical practice. Specifically, his daughter Bryanna suffers primarily from asthma and has recurrent streptococcal pharyngitis and daughter Samantha suffers from failure to thrive and developed recurrent intractable asthma and recurrent streptococcal pharyngitis. With regard to his health, he testified that he has suffered from congenital heart disease since the age of four and that his health began to deteriorate in 2001 when his exercise tolerance became greatly diminished and his heart would race excessively. (Tr. 1980-82.) After his surgery at the Cleveland Clinic in October 2003 he did not practice medicine as defined in his disability policy until approximately 2007. (Tr. 2235-66.) During this period he visited the office at least every other day to supervise and do administrative work. He may

have treated patients in extreme situations and made "social visits" to patients in the hospital. He was available for consultations and review of cases from the Physician Assistants ("PA's") that worked for him, acting in a supervisory capacity. (Tr. 2235-29.) He claimed to have treated the Shadoffs with acupuncture and trigger point injections. (Tr. 1988-89.)

Regarding his tax returns, Lobacz testified that he gave his accountant all necessary paperwork to complete his returns, including the paperwork concerning options income. He denied tampering with documents to evade taxes. He testified that he had a conversation with Donald Reiss in approximately 1999 wherein Donald Reiss told him that some option trading would be taxable and some would not be taxable and advised him to speak to his accountant. According to Lobacz, he received the same advice from his accountant who told him that he would do some research on the tax treatment of options. Lobacz acknowledged it was his signature on the Form 550s for the years 2001-2003 but claimed that no one had ever reviewed or discussed the terms of the Pension Plan with him or explained what a reportable distribution was. He blamed his accountant for incorrectly advising him that certain option trades were not taxable if the options were rolled over to another investment contemporaneously and that if the pension funds were replaced in a timely fashion there would be no tax implications. He testified that Samson would call at year-end and provide the value of assets that needed to be placed into the pension fund to offset the withdrawals during the year. Any pension fund withdrawals were replaced with assets such as gold coins and loose diamonds but

he provided no evidence to support that claim; Lobacz attempted to explain the lack of such evidence as a result of the items being misplaced. (Tr. 1978-26, 2204-08, 2060-67, 2161-89, 2296-99, 2317-29.)

## DISCUSSION

## I.    Standard Governing Claims of Ineffective Assistance of Counsel

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that to prevail on an ineffective assistance of counsel claim, a petitioner must establish (1) that his counsel performed deficiently, and (2) that the deficiency caused actual prejudice. *Id.* at 687. *See also Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002). Under the first prong, "we ask whether counsel's performance was so deficient that, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance." *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (internal quotation marks omitted); *accord Harrington v. Richter*, 562 U.S. 86, 105 (2011) ("[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.") (internal quotation marks omitted). A court must "indulge a strong presumption that counsel's conduct falls within the range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. To satisfy the prejudice prong, a petitioner must show that but for the attorney's deficient performance, there is a reasonable probability

that the result would have been different. *Id.* at 694. More is required than a

mere showing "that the errors had some conceivable effect on the outcome of the

proceeding," as "not every error that conceivably could have influenced the outcome

undermines the reliability of the result of the proceeding." *Id.* at 693. "A

reasonable probability is one sufficient to undermine confidence in the outcome of

the trial or appeal." *Dunham*, 313 F.3d at 730. The Second Circuit has instructed

that a reviewing court should be "highly deferential" to counsel's performance,

because "'[i]t is all too easy for a court, examining counsel's defense after it has

proved unsuccessful, to conclude that a particular act or omission of counsel was

unreasonable.'" *Pratt v. Greiner*, 306 F.3d 1190, 1196 (2d Cir. 2002) (quoting

*Strickland*, 466 U.S. at 689).

Although the test for ineffective assistance of counsel contains two prongs,

the Supreme Court specifically in *Strickland* noted that the federal district courts

need not address both components if a petitioner fails to establish either one. The

relevant excerpt from that decision reads:

> Although we have discussed the performance component
> of an ineffectiveness claim prior to the prejudice
> component, there is no reason for a court deciding an
> ineffective assistance claim to approach the inquiry in the
> same order or even to address both components of the
> inquiry if the defendant makes an insufficient showing on
> one. In particular, a court need not determine whether
> counsel's performance was deficient before examining the
> prejudice suffered by the defendant as a result of the
> alleged deficiencies. The object of an ineffectiveness claim
> is not to grade counsel's performance. If it is easier to
> dispose of an ineffectiveness claim on the ground of lack of

> sufficient prejudice, which we expect will often be so, that
> course should be followed.

466 U.S. at 697.

Since the two *Strickland* requirements are conjunctively stated, the failure to establish either is fatal.

## B.    Defendant's  Contentions

Lobacz's raises two claims in support of his claim that he was denied his Sixth Amendment right to effective assistance of counsel. First, he points to his trial counsel's failure to move for a severance of counts pursuant to Fed. R. Crim. Pro. 14.  Second, he asserts that trial counsel failed to investigate and present witnesses and evidence. (*See* Pet.'s Mem. at 5, 15.)

In response, the Government argues that there are "numerous sound strategic factors, both legal and practical, that would lead counsel to decide not to file a severance" and that Lobacz suffered no prejudice. (Govt's Opp. Mem. at 19.) Similarly, it maintains that the decision not to call the witnesses in question neither fell below the objective standard of reasonableness nor resulted in prejudice.

## C.    Lobacz's Claims Regarding Trial Counsel
## Do Not Warrant  the Relief Requested

### 1.    The Severance Issue

Lobacz's first argument for relief is that he received ineffective assistance of counsel because trial counsel failed to move for a severance of counts pursuant to Fed. R. Crim. P. 14(a). Succinctly stated, he maintains that "where an attorney fails to move for relief from prejudicial joinder, it is per se ineffective to the prejudice of

[Petitioner] requiring vacating the judgment and convictions because that attorney has abandoned his commitment to the client and ceases to serve as a meaningful adversary to the Government." (Pet.'s Mem. at 8.)

To the extent that Lobacz contends that his counsel's failure to move for a severance is a per se violation of his sixth Amendment right to counsel, i.e. that he need not make a particularized showing of prejudice, that claim is rejected. The Second Circuit has recognized per se ineffective assistance claims only in two discrete situations not applicable here. *See United States Griffiths*, 750 F.3d 237, 242 (2d Cir. 2014); *United States v. Rondon*, 204 F.3d 376 (2d Cir. 2000) (stating "[t]o date . . . we have applied the per se rule in only two situations . . ." and listing numerous cases in which the court has refused to apply a per se rule.) *See also Weaver v. Massachusetts*, – U.S. –, 137 S. Ct. 1899 (2017) (prejudice not presumed even where ineffective assistance of counsel claim was premised on a structural error). In fact, the Circuit has held that to succeed on a claim for ineffective of assistance of counsel based on a failure to move for a severance, "a defendant must show both (a) that counsel's failure to move for a severance constituted professional performance that was below an objective standard of reasonableness and (b) that if such a motion had been made [and granted], the outcome of the proceeding would likely have been different [i.e., that defendant suffered prejudice due to counsel's error]." *United States v. Robinson*, 28 Fed. App'x 50, 52 (2d Cir. 2002).

Turning then to the first prong of the Strickland test, two rules of criminal procedure are relevant to the topic at hand. Rule 8(a) which governs joinder of

offenses and Rule 14(a) which governs severances. Rule 8(a) provides in pertinent part that an indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim Pro. 8(a).     Joinder is proper when "common factual elements" of different charges are readily apparent. *United States v. Shellef*, 507 F.3d 82, 97 (2d Cir. 2007). "[C]ounts might be 'connected' if one of the offenses 'depend[s] upon or necessarily [leads] to the commission of the other,' or if proof of one act 'constitute[s] [] or depend[s] upon' proof of the other." *Id.* at 98 (citing and quoting *United States v. Halper*, 590 F.2d 422, 429 (2d Cir. 1978)). Rule 14(a) provides, in pertinent part that "[i]f it appears that a defendant . . . is prejudiced by joinder of offenses . . . in an indictment . . . the court may order an election or separate trials of counts . . . or provide whatever other relief justice requires." Fed. R. Crim. Pro. 14(a).  "Motions to sever are committed to the sound discretion of the trial judge." *United States v. Rittweger,* 524 F.3d 171, 179 (2d Cir. 2008) (internal quotation marks omitted).

Relying principally on *United States v. Halper*, 590 F.3d 422 (2d Cir. 1978), Lobacz  argues that "[t]here was no connection whatsoever in this case between the healthcare fraud and the tax offenses, and while both may be considered of similar character, i.e., fraudulent, that in itself in insufficient." (Def.'s Mem. at 12.)[3] In

---

[3] Lobacz does not dispute that the tax and pensions fraud claims are related for joinder purposes.

*Halper*, the court held that a trial judge erred in permitting two indictments to be tried together where the sums charged in the income tax evasion indictment were not the same funds embraced in the medicaid fraud indictment. In so holding, the court rejected the argument that the offenses charged were "of the same or similar character for purposes of Rule 8(a)" enunciating the rule that a severance is required of offenses "that are purportedly of the same or similar character unless the evidence of the joined offenses would be mutually admissible in separate trials or, if not, unless the evidence is sufficiently simple and distinct to mitigate the dangers otherwise created by such joinder." *Id.* at 430-31 (internal quotation marked omitted). Lobacz posits that since the decision in *Halper* would have required a severance in this case, counsel's failure to move for one satisfies the first prong of the *Strickland* test.

The government, while acknowledging that trial counsel did not consider moving for a severance, counters that there are numerous strategic factors that could lead counsel to decide not to file a severance motion. It argues that given the

> uniform defense to the various charges based on his
> purported ill health and reliance on others with respect to
> his medical practice and his financial affairs [,] [c]ounsel
> may have found it strategically beneficial, given the
> uniform defense, to try all of the charges at once. For
> example, if the charges were severed and there were two
> trials, and the defense based on purported ill health was
> successful at the first trial, it would provided no benefit
> for the second trial. . . . Thus counsel may have viewed
> trying the charges together at one trial and presenting
> the uniform defense once as most likely to result in
> acquittal. Moreover, petitioner's counsel may have been
> of the professional opinion that a single trial, where

> petitioner could explain his version of events once, would
> be more beneficial than testifying at two separate trials,
> given the potential resulting complications attendant to
> cross-examination based on prior testimony and the
> ability of the government to gather additional evidence for
> a second trial after hearing the defendant testify for the
> first time.

(Govt's Opp. Mem. at 19-20.)

While it appears that the health fraud counts may not have been properly joined with the tax fraud and Form 550 counts, the Court need not decide whether in this case counsel's failure to move for a severance fell below the objective standard of reasonableness.[4] Relief is not warranted in this case because of the absence of prejudice. *See generally Zafiro v. United States*, 506 U.S.534, 538-39 (1993) ("Rule 14 does not require severance even if prejudice is shown."); *United States v. Lane*, 474 U.S. 438, 449 (1986)( Rule 8 does not mean that prejudice results whenever its requirement have not been satisfied; misjoinder of one count was harmless where evidence of guilt was overwhelming and jury was instructed to consider each count separately.)

First, the evidence against Lobacz was overwhelming on all counts. Turning first to the healthcare fraud counts, particularly damning was the evidence that (1) despite the frequency of the purported treatments of Lobacz's family members, GHI

---

[4] Indeed, even if such a motion had been made, it is not certain to have been granted. Given the pretrial hearing on the admissibility of Dr. Farr's testimony, the government was aware of Lobacz's overarching "ill health defense" and may have argued, perhaps successfully, that the existence of evidentiary overlap warranted a joint trial of all counts.

received no other claims for doctor visits - such as claims for asthma specialists, pulmonologists or emergency room treatment, - or for prescription drugs or home treatment equipment, such as nebulizers, typically associated with the treatment of asthma; (2) once GHI stopped paying claims submitted under Lobacz's member ID number in 2008, no additional claims for treatments for the Lobacz family were submitted to GHI and no record evidence has been cited to suggest that continued medical care for the purported chronic aliments was thereafter furnished through another insurer or otherwise; and (3) the Shadoff's testimony that they were never treated by Dr. Shin, never received treatments on the weekend, did not know what a triggerpoint injection was, and having moved to Nanuet, New York (some 60 miles from Lobacz's office) in 2002 did not go to Dr. Lobacz more than 2 or 3 times per month, together with the evidence documenting that they were traveling to or at places such as Atlanta, Georgia on days that they were purportedly by being treated by Dr. Shin. The Form 550 counts were amply supported by documentary evidence that Lobacz used the pension fund as his personal piggy bank. The documents include the forms signed by Lobacz falsely attesting that there were no nonexempt or party-in-interest transactions, and the checks and wire transfers from the pension fund used to pay for mortgages on his vacation homes and credit card bills. Lobacz's testimony that he did not understand what constituted a reportable distribution was inconsistent with (1) the Plan Document, signed by Lobacz and in evidence at the trial, which "clearly indicated that using fund assets for one's own interest, deriving personal benefits from one's position as trustee of the fund and

borrowing money from the fund, all constitute prohibited transactions," United States v. Lobacz, 603 Fed. App'x 48, 49 (2015), (2) his testimony - absent any supporting documentation - that he replaced the withdrawn assets with gold coins and loose diamonds, and (3) his history as a sophisticated investor. The evidence of tax fraud was also overwhelming as unreported options income in the amounts of over $37,000 and $985,000 were documented for the years 2000 and 2001 and the testimony demonstrated that Lobacz failed to give information concerning this income to his accountant. Additionally, Lobacz's claim that he was advised that certain trade options were not reportable if the options were rolled over to another investment is belied by his having previously reported options losses as well as Reiss' testimony that at the end of 2000 Lobacz requested certain transactions so that some losses in his account could be used to offset profits made earlier in the year. His assertion that his health issues precluded him from supervising his billing staff and diminished his ability to properly review his tax returns and the Form 550 was, at the very least, problematic in view of his testimony that he was able, inter alia, to supervise the PAs he employed.

Defendant's argument that evidence of one offense would have not been admissible in a separate trial of the other offense is underwhelming. Even if the evidence of the healthcare fraud would not have been admissible in a trial of the other counts and vice versa to show a pattern of fraud and deception, that is not the end of the matter. Had the counts been severed, the government would have had the choice of which group of counts to try first and presumably would have selected

the group for which it believed a stronger case existed. If the government secured a conviction on the first tried count(s), which certainly seems likely given its formidable evidence, the government would have been able to introduce that conviction pursuant to Fed. R. Evid. 609(a)(2).

Lastly, the jury was appropriately instructed to consider each count separately. (Tr. 2610.) *See United States v. Hernandez*, 85 F.3d 1023, 1029–30 (2d Cir.1996) (rejecting a claim of confusion and spillover prejudice where trial court instructed jurors "to consider the evidence against each defendant individually for each count").

In sum, given the overwhelming evidence of guilt, there is no reasonable probability that the result of the trial would have been different had counsel moved for and been granted a severance.

### D.  Failure to Investigate and Present Witnesses and Evidence

1.  <u>Witnesses and Evidence Regarding Lobacz Medical Condition</u>

Lobacz's asserts that his trial counsel failed to present and/or investigate evidence to support his defense. He argues as follows:

> [A]fter my very complicated and life-saving surgery at the Cleveland Clinic in October 2003, I became permanently disabled, signed over my practice to another physician and devoted little time to the medical practice. I had shared with trial counsel my own view that it would be very important to present records of my surgery and my full medical history to the jury along with competent medical witnesses who could and would explain my surgery, my medical condition and the weakened condition I was in following that surgery and the length of my substantial disability. . . . To my chagrin and

> prejudice, trial counsel contacted none [of the contacts I
> gave him for the hospitals where I was hospitalized or my
> doctors who were willing to testify]. Had [he] done so . . .
> this evidence would have undercut the Government's
> claim that, after a brief recuperation, I was back at the
> practice's offices full-time running the practice, seeing
> patients and perpetrating a fraud. it would also have
> supported my testimony as to my disability . . . and the
> fact that I spent little time at the practice and seeing
> patients and did not intentionally defraud anyone or
> intentionally file false tax returns.

(Lobacz Declar. ¶ 12.)

Preliminarily, the Court notes that trial counsel did attempt to present the

testimony of Dr. Farr, a retired cardiologist recommended by Lobacz, that

Defendant's medical condition and medications made it unlikely that he could have

adequately addressed the issues presented in complicated tax returns or practiced

medicine on a daily basis. At a hearing held on October 18, 2010, Dr. Farr testified

that he could not state to a reasonable degree of medical certainty that either

Lobacz's condition or his medication would have precluded him from filing proper

tax returns or from practicing medicine on a daily basis. Moreover, in a letter dated

August 22, 2002, Dr. Farr wrote that Lobacz "may continue his usual activities."

Indeed, as Lobacz's trial counsel notes in his August 3, 2016 affidavit there was

other documentary evidence such as coverage schedules that made Lobacz's claim of

inability unpersuasive. Finally,  counsel offered Dr. Lobacz's medical records into

evidence. In view of the fact that the government did not dispute that Lobacz had

medical problems and was hospitalized, the Court disallowed the records as

cumulative. (Tr. 2094.)

Against this backdrop. Lobacz' claim that trial counsel's investigation was deficient is unpersuasive. Moreover, given that the nature of testimony of the medical professionals that Lobacz claimed should have been called, viz his numerous surgeries and hospitalizations, it would have been cumulative and therefor Lobacz suffered no prejudice.[5]  Also to be considered is Lobacz's own testimony that after his surgery in 2003 he went to the office regularly and frequently where he was available for consultations, to  "supervise" the PA's and perform administrative tasks, as well as his concession that he would see patients "in extreme situations." (*E.g.*,Tr. 2234-38.)

2.    Witnesses Regarding Lobacz's Trading Experience
       and Tax Consequences of Option Trading Gains

Lobacz also claims that counsel's performance was deficient for failing to call Chris Mone, Donald Reiss, and Jim Connolly who allegedly would have contradicted the government's argument that he was an experienced, sophisticated options trader and who would have supported his claim that he believed profits from options trading were not taxable until the account was liquidated.

"The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987); *see also United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002) ("A

---

[5] It is also important to note that as presented this claim would have not resulted in prejudice on the tax fraud counts as two of the three returns at issue were filed prior to October 2003.

failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel."). Thus, an attorney's decision "whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation." *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000); *see also United States v. Schmidt*, 105 F.3d 82, 83 (2d Cir. 1997) (the decision of whether or not to call a particular witness is a matter of trial strategy which the courts will generally not second guess). Here, counsel offers a sound reason for not calling these witnesses.

With respect to Reiss, who was Lobacz's broker at Prudential, counsel declined to call him as "it would be too dangerous to call him because of Prudential's accusations that Lobacz had fabricated a document directing Reiss to sell his investments on Friday August 16, 2002 before the melt down of those investments the following Monday. . . . The timing of the alleged sell order raised a serious question as to Lobacz's credibility. It was also inconsistent with his defense that he was too debilitated to monitor his tax activities or his office billing. Calling Donald Reiss seemed to have no upside." (Pittman Aff. at ¶ 13.) This same reasoning applies to Chris Mone, an attorney with Prudential.

With respect to Jim Connolly, a broker at Merrill Lynch, Lobacz's affidavit contains few details other than that Connolly explained "that 'rolling over' options was an acceptable tax avoidance strategy." (Lobacz Declar. at 16.) Given the absence of any indication in this record that Mr. Connolly proffered this advice before the filing of the tax returns at issue, the claim that counsel's failure to call

him was outside the range of professionally competent assistance necessarily fails.

3.      Cross-Examination of Witnesses

Courts consider the examination of witnesses to fall within the purview of a trial counsel's legal strategy; therefore, decisions related to the nature and scope of cross-examination will generally not support a claim of ineffective assistance of counsel. *United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992) (holding that trial lawyer was effective, despite defendant's claim that lawyer failed to thoroughly impeach prosecution witness); *Nersesian*, 824 F.2d at 1321 ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature."). "[T]he conduct of examination and cross-examination is entrusted to the judgment of the lawyer, ... and [a court] should not second-guess such decisions unless there is no strategic or tactical justification for the course taken." *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) (citing *Eisen*, 974 F.2d at 265). After reviewing the record of counsel's cross-examination of the government's witnesses, the claim that it fell below professional representation is rejected.

4.      Failure to Call Character Witnesses

Lobacz does not identify in either his moving or reply affidavit the names of the character witnesses he claims he gave to trial counsel. Thus, this claim provides no basis for relief. Moreover, according to trial counsel's declaration his inquiries led him to believe that Lobacz was not well regarded by his fellow physicians.

5. Failure to Call Doctors to Testify that Stress
Necessitated Treatment of his Children

According to Lobacz, trial counsel failed to call Drs. Jim Ferguson and Ed Yambo as witnesses or or even contact them. He asserts that they "would have explained the effect of stress on my children brought by the actions of the Krause family, which, in turn, necessitated certain treatments." (Lobacz Reply Declar. at ¶ 12.) This claims fails due to the absence of prejudice given that the Court precluded testimony concerning the actions of the Krauses[6] (e.g. Tr. at 1971) as the cause of the panic attack which resulted in the asthma allegedly suffered by the Lobacz children was irrelevant. So too, unless the cause of the asthma dictates the treatment, a claim not enunciated here, the testimony of the two referenced doctors is irrelevant.

6. The Failure to Obtain Dr. Shin's Medical Records

Lobacz faults trial counsel for not obtaining Dr. Shin's medical records which he "believe[s][] would have demonstrated that at the time of his testimony Dr. Shin lacked full mental capacity and the jury could not rely on his failed memory of important facts reflected in his testimony acknowledging his signature and that he completed and signed paperwork documenting that he had treated the Shadoffs, but then testified that he had not." (Lobacz Reply Declar. at ¶ 11.) Laying aside that Dr. Lobacz provides no basis for his belief as to the contents of these records, their

---

[6] According to the representations made at trial the Krauses were neighbors of the Lobaczs and engaged in conduct that caused panic attacks in the two Lobacz children.

absence created no prejudice. Even if the jury could not rely upon Dr. Shin's testimony, the testimony of the Shadoffs themselves amply supports that they were not treated by Dr. Shin.

### 7.   The Inebriation Claim

No evidence has been presented to substantiate the claim that trial counsel was inebriated except Lobacz' declaration, which, even if taken as true, fails to establish that defense counsel was intoxicated in court. Counsel for the government attests that he did not observe any such conduct and would have brought it to the attention of the Court if he had. The same is true of the Court. There is no way the Court would have allowed trial counsel to continue if there was even the slightest hint that he was impaired in any way by alcohol. There is simply no evidence whatsoever to support the spurious claim defendant now makes. Indeed, as Lobacz's trial counsel points out, he is a diabetic and as his doctor Lobacz took bi-weekly blood tests from him which tests did not show the presence of any alcohol.

### 7.   Summary

Having considered all of Defendant's claims both individually and cumulatively, the Court is confident that there is no "reasonable probability," i.e. "one sufficient to undermine confidence in the outcome of the trial," "that, but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different." *Dunham*, 313 F.3d at 730. Simply put, the evidence against Lobacz as to each count of conviction was overwhelming.

## CONCLUSION

Defendant's motion for relief pursuant to 28 U.S.C. § 2255 is denied.

**SO ORDERED.**

Dated: Central, Islip, New York
    January 18, 2018

                                  s/  Denis R. Hurley
                                  Denis R. Hurley
                                  United States District Judge